# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

LORI ANNE TROOP,

              Plaintiff,

    v.                                             Case No. 09-CV-803

MICHAEL J. ASTRUE, Commissioner for
the Social Security Administration,

              Defendant.

_____

## ORDER

On June 26, 2006, plaintiff Lori A. Troop ("Troop") filed an application for Supplemental Security Income ("SSI") with the Social Security Administration, alleging a disability beginning July 1, 2003. Troop's disability claims were denied both upon the initial application and upon reconsideration. After these denials, Troop filed for a hearing before an Administrative Law Judge ("ALJ"). A hearing occurred on March 10, 2009, where Troop testified. On March 16, 2009, the ALJ concluded that Troop was ineligible for SSI. Subsequently, the Appeals Council of the Social Security Administration denied review, rendering the ALJ's decision final. As a consequence, Troop filed this action for judicial review of the Commissioner of Social Security's decision denying the plaintiff's application for SSI. The court begins by reviewing the factual and procedural background that precipitated this litigation based on the record that was presented to the ALJ.

# BACKGROUND

## A.     Claimant's Testimony and Agency Decision

Troop was forty-seven years old and residing in Milwaukee, Wisconsin, at the date of the ALJ's decision. (Tr. 28). Troop has a limited education – she completed eighth grade. (Tr. 32). The claimant reports her only work experience as housekeeping and a factory assembly job, both of which lasted for less than six months. (Tr. 29). Troop is currently attending classes, about three times per week, to obtain her General Educational Diploma ("GED"). (Tr. 39).

At the hearing, the claimant testified that she was disabled due to a mental illness. (Tr. 32). She explained that she had a lot of mood swings, did not get along with people, heard voices, and experienced visual hallucinations of dead people. (Tr. 33). She testified that the voices would tell her to kill herself and to kill others, yet she presently had no intention of doing either. (Tr. 33). Troop reported that these hallucinations happen frequently, yet most of the time she is able to understand that they are not real. (Tr. 34). She also said that closing her eyes and praying makes the hallucinations disappear. (Tr. 34). The claimant takes prescription medication to help with her symptoms. (Tr. 35). She claims the medication works well for her currently. (Tr. 35). Troop expressed doubt about her ability to ever work. (Tr. 44). She reiterated that she has trouble getting along with people, which could lead to problems with her coworkers. (Tr. 44).

Troop acknowledged that her physical health is "all right." (Tr. 32). According to the ALJ and the claimant's testimony, she is only alleging mental illness as her reason for seeking SSI. (Tr. 18, 32). However, the claimant does have diabetes, although she has lost weight and no longer needs to use insulin. (Tr. 31). Troop also suffers from non-symptomatic hepatitis C. (Tr. 13).

Troop testified about her daily activities. She typically gets up, dresses, has breakfast, watches television, has lunch, takes an occasional walk, has dinner, and goes to bed. (Tr. 30). She also testified that she has her grandchildren spend the weekends with her, and they play video games and read to each other. (Tr. 37).

The claimant also discussed her criminal history. According to the ALJ, the claimant's offenses include forgery, participation in armed robbery, prostitution, and drug-related offenses. (Tr. 14). Troop explained that she had been in prison twice, first for armed robbery in about 1990 or 1991 and next for forgery in around 2002 or 2004. (Tr. 41). The claimant reported that both of these incarcerations "revolved around [her use of] drugs." (Tr. 42). During her second imprisonment, Troop was a "model prisoner" and moved quickly from a high security prison to a low security prison. (Tr. 42). She reported experiencing the hallucinations in prison. (Tr. 43). The claimant has remained drug-free and sober since her latest release from prison. (Tr. 14).

The claimant was hospitalized voluntarily on two occasions due to her expression of suicidal ideation. (Tr. 14, 43). Her second hospitalization occurred

after she injured her ankle slipping on some ice in December of 2006. (Tr. 30).

Troop reports that the combination of her ankle injury, depression, hallucinations,

and suicidal ideation caused her to seek hospitalization after consultation with her

treating physician, Dr. Ortell. (Tr. 43-44).

## B. Claimant's Medical Record

Troop has received a series of mental status evaluations and health care

provider opinions regarding her mental impairments. While in prison, Troop had a

mental health screening done in April of 2005 by Judy L. Williams, Ph.D., Licensed

Psychologist. (Tr. 274). At this time, the claimant was on medication to manage her

hallucinations. (Tr. 274). Williams noted that the claimant was alert and oriented,

and though she sometimes had to stop and think about an answer to a question,

Troop's answers were always clear and appropriate. (Tr. 274). At the evaluation,

Troop denied current feelings of depression or thoughts of self-harm. (Tr. 274).

Williams also noted that the claimant denied any current hallucinations, an indication

that on her medications the hallucinations stop. (Tr. 274). Williams marked that

Troop was in the MH-2 classification, meaning she had a diagnostic or functional

Serious Medical Illness ("SMI"). (Tr. 274).

In June of 2005, Troop was seen at the prison clinic by Robert McQueeney,

M.D. (Tr. 268-70). McQueeney notes the conflicting nature of the claimant's mental

health history, her reports of hallucinations and suicidal ideation, and then her

denials of the same symptoms. (Tr. 268). McQueeney reports that the claimant was

calm, friendly and cooperative, expressing a desire to be off all her psychiatric medications. (Tr. 270). He also reports that she was not depressed, not anxious and had no psychotic symptoms. (Tr. 270). He decreased her medication. (Tr. 270).

In July 2005, the claimant saw Brett Reynolds, M.D., for a regular medication check. (Tr. 266-67). At this check-up, Troop reported that she had no specific psychiatric complaints or concerns. (Tr. 266). The claimant was seen by another doctor at the prison clinic in October 2005. (Tr. 264-65). Troop's affect was slow and reactive, and she reported being "on the depressed side" since the prescription for her mood stabilizers had been decreased. (Tr 264). In November 2005, the claimant reported no mental health problems. (Tr. 262). In March 2006, the claimant reported her only mental health medication was Trazodone to help her sleep. (Tr. 261). It was discontinued when she reported having headaches with the medication. (Tr. 261). On examination, Troop denied hallucinations and seemed alert and oriented. (Tr. 261).

In August 2006, after being released from prison, Keith Bauer, Ph.D., reviewed Troop's records and completed a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 289-90). Bauer reported that, other than some moderate limitations with social interaction, claimant had no significant limitation in any other functional areas. (Tr. 289-90). More specifically, Bauer's report shows he found the claimant to have moderate limitations in social functioning, mild limitations in her

activities of daily living, and mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 303).

In September 2006, Troop returned to her treating psychiatrist, Dr. Ortell.  (Tr. 469).  Dr. Ortell noted that the claimant was getting continued structured treatment for her past drug and alcohol abuse, and that the claimant was calm, straightforward, made good eye contact, and followed the conversation without difficulty.  (Tr. 469).  He also reported that the claimant was still having psychotic symptoms and was at "a fairly high risk for having continued problems."  (Tr. 469).  In October 2006, Troop reported that she was doing well with her medications, except that she felt nervous.  (Tr. 467).  A week later, Troop reported that she was feeling better, except that she was groggy in the mornings, so Dr. Ortell changed her medications.  (Tr. 466).  At the end of December 2006, the claimant reported that she could not "take it any more."  (Tr. 465).  She felt her medications were no longer working because she was having the hallucinations again and thinking about suicide.  (Tr. 465).  Because she seemed overwhelmed, tearful and agitated, Dr. Ortell sent her to the mental health complex, where she was admitted.  (Tr. 465).

At her admission, Troop saw J. Bloomstein, M.D. and reported she had been under stress since her release from prison in August 2006.  (Tr. 333).  Troop further explained that her problems started when she ran out of Ambien about a month prior to the hospitalization.  (Tr. 354).  Troop's diagnoses were schizo-affective disorder of the bipolar type and major depression with psychotic features.  (Tr. 326).  At

admission, Troop's Global Assessment of Functioning ("GAF")[1] score was 27. (Tr. 316). Troop improved rapidly over her week of hospitalization. (Tr. 333). At her discharge, her GAF score was 60 and Kathleen Burroughs, Ph.D., noted that Troop had engaged in no dangerous behavior on the unit and denied having hallucinations or suicidal ideation. (Tr. 345, 352). The discharge summary revealed that the claimant had also been hospitalized for suicidal ideation from November 15 to November 25, 2003, and from December 10 to December 17, 2003, for suicidal and homicidal ideation. (Tr. 349-50).

In January of 2007, Troop returned to Dr. Ortell and reported that her recent hospitalization had been "quite helpful." (Tr. 464). In this same month, Roger Rattan, Ph.D., reviewed the claimant's records and opined that Troop was moderately limited in her ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from her symptoms, and to respond appropriately to changes in the work setting. (Tr. 371-72). In the other seventeen functional areas, Troop was found to be not significantly limited. (Tr. 371-72). The claimant continued to see Dr. Ortell from February 2007 through February 2009. Dr. Ortell filled out a form in March 2007 stating that Troop's prognosis was "poor" and she had restrictions in nearly all functional areas asked

_____

[1] The Global Assessment of Functioning scale reports a clinician's assessment of an individual's overall level of functioning. *Craft v. Astrue*, 539 F.3d 668, 676 n.7 (7th Cir. 2008). GAF scores run from 0 to 100 and indicate an increasing ability to function as the numbers get larger. *Kluesner v. Astrue*, 607 F.3d 533, 535 (8th Cir. 2010).

about on the form. (Tr. 451).[2] Dr. Ortell's records indicate that Troop continued to have some problems with hallucinations and suicidal ideation throughout 2007. (Tr. 460-62). Dr. Ortell adjusted her medications accordingly, and by October 2007 Troop reported that things were "going okay." (Tr. 462).

In May 2008, Dr. Ortell wrote a note stating that Troop was being treated for schizo-affective disorder of the bipolar type. (Tr. 449). He reported that due to her continued psychiatric impairment, she was unable to work. (Tr. 449). Throughout 2008, Troop saw Dr. Ortell and would report on the fluctuation of her symptoms. (Tr. 452-57). In February 2009, Dr. Ortell wrote another note and filled out a Mental Impairment Assessment Form. (Tr. 470-71). The note stated that the claimant was unable to work due to her continued psychiatric impairment. (Tr. 470). The form stated that Troop's symptoms would exacerbate if she performed tasks at a consistent pace, performed routine tasks, interacted with co-workers, had public contact, performed detailed tasks or decision-making, was subject to noise, strict deadlines, or fast-paced tasks. (Tr. 471). He also stated on the form that Troop would miss three or more days of work a month. (Tr. 471). He also opined that the claimant had extreme restrictions and either fair or poor-to-no ability to perform basic work activities. (Tr. 472). He gave Troop a GAF score of 40. (Tr. 471).

---

[2]The Court notes that this form is nearly illegible.

# DISCUSSION

When reviewing a Social Security benefits determination, the court must uphold the ALJ's decision if it is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence is such relevant evidence "as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). In determining whether substantial evidence exists, the court reviews the record as a whole; however, the court will not substitute its judgment for that of the agency "by reconsidering facts, re-weighing the evidence, resolving conflicts in evidence or deciding questions of credibility." *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001) (citing *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)). Thus, the standard of review is deferential, requiring only that the ALJ minimally articulate his analysis. Even so, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ is required to build an "accurate and logical bridge" between the evidence and the result. *Id.* at 941. This is not to say that the ALJ must discuss every piece of evidence or testimony. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001). All the ALJ must provide is a "small glimpse" into his reasoning. *Id.*

On the other hand, conclusions of law are not entitled to such deference. Thus, if the ALJ commits an error of law, reversal is required "without regard to the volume of evidence in support of the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

To qualify for disability benefits under the Social Security Act, a claimant must be found "disabled." 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting 42 U.S.C. § 423(d)(1)(A)); 20 C.F.R. § 416.905(a). The Social Security regulations create a five-step, sequential test for determining whether a claimant is disabled. *Briscoe v. Barnhart*, 425 F.3d at 351. The first step considers whether the claimant is presently employed. 20 C.F.R. § 416.920(a)(4). The second step evaluates whether an alleged physical or mental impairment (or a combination of impairments) is severe, medically determinable, and meets a durational requirement. *Id.* The third step compares the impairment to a list of impairments that are considered conclusively disabling. *Id.* If the impairment equals one of the listed impairments, the claimant is considered disabled; if the impairment does not equal a listed impairment, the evaluation continues. *Id.* The fourth step assesses a claimant's RFC and ability to engage in past relevant work. *Id.* If the claimant is able to

engage in past relevant work, the claimant is not disabled. *Id.* If the claimant has no past relevant work or is unable to engage in this work, the disability determination moves to step five. *Id.* The fifth step also assesses the claimant's RFC, as well as her age, education, and work experience. *Id.* If the claimant can make an adjustment to other work, based on all these factors, she is not disabled. *Id.*

The court begins by reviewing the decision of the ALJ. In this case, at steps one and two, the ALJ determined that Troop had not engaged in substantial gainful activity since June of 2006 and that she had severe impairments due to mental illness. (Tr. 12).[3] At step three, the ALJ determined that the claimant's combination of impairments did not equal any of the listed impairments. (Tr. 13). The ALJ next determined that Troop had an RFC to perform "a wide range of unskilled work at all exertional levels." (Tr. 13). At step four of the sequential analysis, the ALJ concluded that Troop had no past relevant work. (Tr. 13).[4] At step five, after taking into account Troop's status as a younger individual, her limited education, her lack of work experience, and her RFC, the ALJ concluded that there were jobs that exist in "significant numbers in the national economy that the claimant can perform." (Tr. 13). Accordingly, the ALJ found that the claimant was not entitled to SSI.

---

[3]The ALJ noted that he asked the claimant if mental illness or mental impairment was the basis of her case, to which the claimant responded "yes." (Tr. 18). The ALJ's decision and the record show that, while the claimant did suffer from some physical impairments, her allegations as to disability stem from mental impairments and not physical impairments. Thus, this court will focus its analysis on Troop's mental impairments.

[4]In fact, Troop did work in a housekeeping and factory assembly job. However, the ALJ determined that these jobs were of short duration and in the distant past, such that they do not qualify as "past relevant work" as defined in 20 C.F.R. § 404.1560(b)(1).

Troop disputes the ALJ's determination and alleges that he committed several errors in reaching his conclusions. First, Troop argues the ALJ erred in making his credibility determination. (Pl.'s Br. 20). The claimant then argues that the ALJ erred in his determination of the RFC and relied inappropriately on his own medical conclusions instead of relying on the medical evidence. (Pl.'s Br. 17-18). Next, the claimant alleges that the ALJ erred in his evaluation of the opinions of Troop's treating physician. (Pl.'s Br. 13). Lastly, Troop argues the ALJ erred by not using a vocational expert at step five of his analysis. (Pl.'s Br. 10).

## A.    Troop's Credibility

Troop contends that the ALJ's credibility determination is "legally and factually erroneous." (Pl.'s Br. 20).[5] We review an ALJ's credibility determination with deference because an ALJ, not a reviewing court, is in the best position to evaluate credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). In evaluating the credibility of Troop's statements about her impairments and their effect on her ability to work, the ALJ must consider all the evidence in the record, including medical signs and laboratory findings, opinions provided by treating and examining physicians and psychologists, and statements or reports by Troop and those who treated or examined her about her medical history, treatment, work history, daily

---

[5] The claimant's gripes with the ALJ's methodology in making his credibility determination are not with regard to an interpretation of a law or regulation, but with respect to how the ALJ resolved factual questions. As such, the substantial evidence standard is the correct standard to evaluate the issues raised by the claimant. *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

activities, and ability to work. *See* SSR 96-7p, 1996 WL 374186, at *6-7. A reviewing court may reverse an ALJ's credibility determination only if it is so lacking in explanation or support that it is "patently wrong." *Simila v. Astrue*, 573 F.3d at 517.

Troop takes issue with two aspects of the ALJ's credibility determination. Troop's main argument is that the ALJ failed to demonstrate an understanding of her mental impairments and how those mental impairments may have played a role in her criminal behavior, a factor the ALJ relied upon in discounting Troop's credibility. (Pl.'s Br. 20-21); (Tr. 17). The claimant relies on *Bauer v. Astrue,* 532 F.3d 606 (7th Cir. 2008), to support her criticism of the ALJ's credibility determination in this respect. In *Bauer,* the court found that substantial evidence did not support the ALJ's determination to discount evidence from a claimant's treating physician that her bipolar disorder prevented her from holding down a full-time job. *Bauer,* 532 F.3d at 608. The court criticized the ALJ's reasoning for discounting the treating source's opinion because it "suggested a lack of acquaintance with bipolar disorder." *Id.* The claimant in this case attempts to use a similar argument as the *Bauer* court, yet her criticism is directed at the ALJ's credibility determination and not at his failure to give controlling weight to the treating source's opinion, an issue governed by the treating source rule.

Troop contends that her mental illness was not adequately understood by the ALJ in his assessment of the weight to give her criminal history in his credibility determination. (Pl.'s Br. 20). She argues that her drug-related criminal behavior

may be a symptom of her mental illness, and thus should not be treated as a factor weighing against her credibility, but instead as a factor supporting her claim of disability. (Pl.'s Br. 20). The court recognizes the merit of this argument, however, we still find that substantial evidence supports the ALJ's determination of Troop's credibility, including the manner in which he considered the claimant's criminal past.

As the court has stated before, we will not reconsider facts, re-weigh the evidence or make decisions about credibility. *Schoenfeld v. Apfel*, 237 F.3d at 792. We will only ensure that the ALJ built a "logical and accurate bridge" from the evidence to the result. *Steele v. Barnhart*, 290 F.3d at 941. In this case, there is evidence in the record, including testimony by the claimant, outlining her criminal past. (Tr. 14, 41-42). On the other hand, the record says nothing about the influence of Troop's mental illness on her criminal behavior. Furthermore, the ALJ did articulate his reasoning for discounting Troop's credibility based on her criminal past. He noted that the dishonest nature of Troop's criminal past – her incarceration for forgery specifically – weighed against her credibility as to her allegations of impairment. (Tr. 17). The ALJ also questioned Troop's credibility because of her almost total lack of work experience except for criminal activity. (Tr. 17). At the same time, the ALJ gave Troop credit for her rehabilitation, the fact that she has remained drug-free and sober since her release from prison in 2006, as well as her status as a model prisoner during her incarceration. (Tr. 14). Therefore, the ALJ appropriately considered the relevant evidence about Troop's criminal activity and

minimally articulated why he found this past behavior to weigh against her credibility. Accordingly, the court finds that the ALJ gave an adequate explanation, supported by substantial evidence, for why the claimant's criminal behavior negatively affected his credibility determination.

The claimant also argues that it was inappropriate for the ALJ to discount her credibility based on her initial lack of forthrightness during testimony, especially when the claimant provided more details upon further inquiry. (Pl.'s Br. 21). This court agrees that the ALJ is in the best position to observe the demeanor and veracity of a testifying witness, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). However, the determination of credibility must contain specific reasons for a credibility finding. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The finding must be "supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.*

In this case, the ALJ reported that he was troubled by Troop's vague responses during testimony. (Tr. 17, 19). The ALJ explained that he twice asked the claimant about her daily activities and she failed to reveal "significant activit[ies]." (Tr. 21). He noted that it was only upon a third attempt to illicit more information that the claimant fully disclosed the extent of her activities. (Tr. 21). The ALJ then found, based on her indefinite and incomplete testimony, that the claimant was not entirely credible. (Tr. 21). The record confirms that the ALJ had to prompt the claimant for more information during her testimony. (Tr. 28-47). The record also indicates that

once prompted Troop revealed information which the ALJ found to weigh against her allegations of disability. (Tr. 20). For example, when first asked about her daily activities, Troop said nothing about taking care of her grandchildren. (Tr. 30). Later during her testimony, Troop discussed her frequent interactions with her grandchildren, including their overnight stays with her, their playing of video games, their reading to each other, and their taking walks together. (Tr. 37-38). She also revealed that she is taking GED classes away from home about three times a week. (Tr. 20). The court is satisfied that the ALJ's decision to discount the claimant's credibility, based on her initial lack of forthrightness, was supported by substantial evidence because a "reasonable mind [could] accept" the above-cited evidence to support this determination. *Richardson v. Perales,* 402 U.S. at 401. Moreover, the ALJ gave specific reasons for his decision that were far from "patently wrong." Consequently, the court cannot find error with the ALJ's credibility determination.

## B. Residual Functional Capacity

The claimant next challenges the ALJ's determination of her RFC finding that Troop can perform a wide range of unskilled work at all exertional levels. (Pl.'s Br. 17). The claimant argues the ALJ erred in making the RFC determination because: 1) the ALJ failed to specify which impairments he deemed medically-determinable and severe at step two of the sequential analysis; and 2) the ALJ failed to conduct a required function-by-function assessment of her impairments. (Pl.'s Br. 17).

A claimant's RFC is the work she can still do despite her physical and mental limitations. *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)); *Hickman v. Apfel*, 187 F.3d 683, 68-89 (7th Cir. 1999). In making the RFC determination, the ALJ "must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (quoting S.S.R. 96-8p).

### 1.    Step Two Analysis

We first answer the question of whether the ALJ erred in his step two analysis by not explicitly articulating what he found to be Troop's severe and medically determinable impairments. After reviewing the ALJ's step two determination, it is clear that he made no additional comments, at least in his findings section, beyond the conclusion that Troop suffers from a severe combination of impairments. (Tr. 12). However, an ALJ need not evaluate every piece of evidence in writing. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). This is especially true at step two of the sequential assessment. *See Morgan v. Astrue,* No. 07 C 1741, 2009 WL 650364, at *8 (N.D.ILL. Mar. 9, 2009) (finding no case has been remanded "solely on the basis of a step two determination that was favorable to a claimant, but cursory"). The court in *Morgan* held that if the ALJ finds in the claimant's favor at step two and proceeds to the next step, as happened in this case, lack of discussion by the ALJ provided at step two is not reversible error. *Id.* While this court agrees with the

above precedent, we are also of the view that there does need to be some evaluation of the evidence at this step. *See* SSR 96-3p and 96-4p.

The ALJ could have done a better job of developing the record in this regard, as the court agrees with the claimant that it is difficult to determine which of Troop's impairments the ALJ found to be medically determinable or severe.[6] Yet, with a careful review of the ALJ's opinion, the court is satisfied that the ALJ did determine the claimant's schizo-affective disorder of the bipolar type to be her severe medically determinable impairment, although he never said so explicitly. (Tr. 12-13). Furthermore, the court finds this determination to be supported by substantial evidence for the following reasons. First, the ALJ's initial paragraph of analysis notes the claimant's history of treatment for "affective disorders with . . . schizoid features." (Tr. 13). The ALJ then states that, although the claimant's condition does not meet or equal the regulations' listing for affective disorders or any other disorder, the record indicates that Troop does have symptoms caused by her mental illness that interfere with her functional abilities. (Tr. 13). A review of the record indicates that out of the many psychological examinations and evaluations that Troop underwent while in prison and afterwards, the claimant was consistently found to

---

[6]The regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, but this determination can never be made based on symptoms alone. 20 C.F.R. §§ 404.1528, 404.1529. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities. *Id.*

either fall in the MH-2 category – which indicates a serious mental illness – or to have depressive disorder, bipolar disorder, or schizo-affective disorder. (Tr. 261, 262, 264, 267, 269-87, 326, 449). Furthermore, the ALJ notes in his opinion that he asked the claimant if mental impairment was the basis for her case, to which the claimant responded "yes." (Tr. 18).

Thus, although the ALJ neglected to discuss explicitly what Troop's severe medically determinable impairment actually was, the ALJ's opinion assumed Troop's schizo-affective disorder to be her severe and medically determinable impairment. Furthermore, because the ALJ found in Troop's favor at this step, it is less crucial that he articulate with particularity how he arrived at the step two determination.[7] If the ALJ were to have found that the claimant's impairments were not severe, the court would expect the ALJ to provide more precise explanatory documentation at this step. In any event, the ALJ's cursory analysis of Troop's impairments at step two is not, by itself, an error that is cause for remand, as the ALJ found in Troop's favor.[8]

---

[7]This is because the finding of severity at step two is really meant to make the evaluation process more efficient and reliable by "identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled . . ." *Bowen v. Yuckert,* 482 U.S. 127, 153, 107 S. Ct. 2287, 96 L.Ed.2d. 119 (1987).

[8] The court agrees that "[n]o principle of administrative law or common sense requires [this court] to remand a case in [a] quest for the perfect opinion unless there is reason to believe that remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

## 2. Function-by-Function Assessment

The claimant's challenge of her RFC is not limited to a criticism of the ALJ's cursory step two determination. The crux of Troop's argument is that this failure to articulate the claimant's medically determinable and severe impairments affected the ALJ's finding of RFC. (Pl.'s Br. 17). Specifically, Troop argues that the ALJ's failure to perform a function-by-function assessment of her limitations caused the ALJ to incorrectly classify her capacity for work. (Pl.'s Br. 17-18). On the other hand, the defendant responds by contending that the law does not mandate such an assessment, and instead asks merely that the ALJ describe "the maximum amount of work-related activity the individual can perform based on the evidence in the case record." (Def.'s Br. 13); *See* SSR 96-8p, 61 Fed.Reg. 34474, 34475 (1996). The defendant also asserts that the ALJ met this requirement. (Def.'s Br. 13).

The ALJ is responsible for determining a claimant's RFC based on all functional limitations resulting from the claimant's medically determinable impairments or combination of impairments. 20 C.F.R. § 404.1546(c); SSR 96-8p. In determining a claimant's RFC, the ALJ must conduct a function-by-function analysis of the limitations on the claimant's work-related abilities and provide a narrative discussion of each conclusion. *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 352-53 (7th Cir. 2005); SSR 96-8p. This assessment must be based on all the

relevant evidence in the case record. SSR 96-8p.[9] The narrative discussion must describe how the evidence supports each conclusion, citing specific medical facts such as laboratory findings, and non-medical evidence such as daily activities or observations. *Id.* Reversal and remand are warranted when the ALJ fails to explain his conclusions. *Briscoe*, 425 F.3d at 352.

Therefore, the court agrees with the plaintiff that the ALJ was required to conduct a function-by-function assessment of the claimant's limitations and their effect on her work-related abilities. However, we disagree with the plaintiff that this assessment did not occur. Again, the ALJ could have done a better job of organizing his analysis so as to allow for a more meaningful review by both the court and the involved parties. Yet, a careful examination of the ALJ's decision reveals that he did make the appropriate assessment.

First, the ALJ generally considered Troop's physical limitations, although the claimant had not alleged these as a reason for seeking SSI. (Tr. 14). He found that Troop's Hepatitis C was not symptomatic, her diabetes was under control, and that while she had broken her ankle in December of 2006, the injury had healed well and was not asserted as a matter of disability. (Tr. 14, 18). Based on her good physical

---

[9]This includes evidence such as "medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g. frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms . . . that are reasonably attributed to medically determinable impairments, evidence from attempts to work, need for structured living environment, and work evaluations, if available." SSR 96-8p.

health and the fact that the claimant is considered a younger individual, the ALJ concluded that a vast number of job opportunities are available to her. (Tr. 24).

The ALJ also considered the claimant's symptoms and limitations relating to her mental impairments. He analyzed her subjective complaints about her symptoms and medical evidence in the record, as well as all other relevant evidence in determining her RFC. In his second paragraph, the ALJ listed the work-related functions affected by the claimant's limitations. (Tr. 13). He found that Troop's limitations mildly interfere with: 1) her range of daily activities; 2) her social participation; and 3) her ability to concentrate. (Tr. 13). These findings are supported by substantial evidence in the record. For example, the claimant had two RFC Assessments performed that rated her functional limitations and that are mostly consistent with the ALJ's findings. (Tr. 289-303, 371-72).[10]

The ALJ considered the claimant's testimony in his assessment of Troop's limitations on her work-related abilities. He first found that the claimant complained of experiencing mood swings. (Tr. 14). The claimant stated that she does not like being around people because she gets angry easily and this affects her ability to work. (Tr. 14, 44). However, the ALJ also found that the claimant has learned to control her mood swings and anger in some respects. (Tr. 21). For example, the

---

[10]One of the assessments notes that Troop has moderate limitations in maintaining social functioning, (Tr. 303); however, the other finds that the claimant is not significantly limited in her abilities for social interaction. (Tr. 372). The court notes here that the ALJ did not give controlling weight to the treating source's opinion that Troop was extremely limited and had either fair or poor-to-no ability to perform basic work activities. (Tr. 472). In the next section, the court will discuss at length whether the ALJ erred in not giving controlling weight to the treating source's opinion.

claimant testified that she has no problem controlling her anger with her landlord or her grandchildren. (Tr. 21). She often takes care of her grandchildren, having them spend the night, reading to them, and playing video games with them. (Tr. 21, 37-38). The ALJ also found, from both the claimant's testimony and her medical records, that she is an obedient patient. (Tr. 21). The ALJ determined that even though her medical records indicate Troop's variability in mood, the records also demonstrate Troop's ability to relate well to clinical staff, explain her symptoms, discuss her treatment and appreciate her conditions. (Tr. 16). Thus, based on these findings, the ALJ concluded that the claimant "might do better at work where she has her own workstation or where interaction with others is perfunctory only." (Tr. 14). He also explained that unskilled work is of this type and typically only requires basic concentration and interactions with things and not people. (Tr. 23). Thus, the ALJ did explain a part of his reasoning for finding that the claimant could perform a wide range of unskilled work even though she has some limitations that mildly interfere with her social functioning, range of activities, and concentration.

The ALJ also considered the claimant's complaints about experiencing auditory and visual hallucinations. Troop stated during testimony that she hears and sees dead people. (Tr. 33). However, the ALJ found, based on the full record, that the claimant was able to recognize that these voices were not real. (Tr. 14, 33-34). The ALJ also found, based on her prison and hospital medical records as well as her testimony, that Troop was able to make the hallucinations disappear quickly by

closing her eyes and praying, and that her medications typically keep the hallucinations from occurring. (Tr. 19). The ALJ expressed doubt about the veracity of the claimant's complaints regarding the hallucinations because she was vague and general in her description of these experiences. (Tr. 19). He then concluded that Troop grossly exaggerates the intensity, frequency, and duration of her symptoms, including the hallucinations. (Tr. 23). He determined, based on her testimony, that the visual and auditory experiences Troop complained of seemed to be closer to "bad dreams or bad memories" rather than hallucinations. (Tr. 18). In turn, the ALJ considered these auditory and visual experiences in his assessment of the claimant's ability to work. He found that there are vast numbers of jobs for people who have "occasional short interruptions of a wandering mind or bad memories." (Tr. 23). He concluded the best work opportunity for someone with such a limitation is in a routine, well-defined, predictable job that requires only basic concentration. (Tr. 23). Thus, the ALJ did assess the limitations caused by the claimant's symptoms. He also provided a narrative discussion for why he concluded that, despite her limitations, Troop could still perform certain types of unskilled work.

Moreover, the ALJ took into account the claimant's hospitalizations in assessing how her symptoms may affect her ability to work. (Tr. 14-16). He reviewed the evidence of these hospitalizations, including the claimant's testimony about the hospitalizations and her statements to health care providers about the hospitalizations. (Tr. 14-16). The ALJ also considered hospital records and

observations of staffers. (Tr. 14-15). The ALJ found that Troop was voluntarily hospitalized after she expressed suicidal ideation to her treating physician, but once admitted, Troop denied suicidal ideation. (Tr. 15). The ALJ also found that the claimant improved rapidly during her hospitalization and was upbeat and positive about the future upon her discharge. (Tr. 15-16). Based on this information, the ALJ concluded that, though the hospitalizations of the claimant demonstrate the impact her symptoms can have, Troop has only had two "widely spaced" episodes requiring hospitalization in six years and both resolved well. (Tr. 13). The court implies from this conclusion that the ALJ found the hospitalizations were not significant enough interruptions to limit any range of work that Troop could perform.

Therefore, the ALJ, aided by the appropriate evidence, has made an appropriate function-by-function assessment of Troop's limitations and has adequately articulated his conclusion that Troop can perform a wide range of unskilled work at all exertional levels.

The claimant also argues that the ALJ improperly relied upon his own medical opinions as evidence in determining her RFC. (Pl.'s Br. 18-20). The claimant is correct in noting that the ALJ may not play doctor and make his own independent medical findings. *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996). On the other hand, in making the RFC determination, the ALJ considers the entire record, including all relevant medical and non-medical evidence, which includes the claimant's own statements of what she can or cannot do. *See* 20 C.F.R.

§ 404.1545(a).  If conflicts exist in the medical evidence, the ALJ is charged with the responsibility of resolving that conflict.  *See Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995).  In doing so, the ALJ need not accept only physicians' opinions.  *Id.*

Troop argues that the ALJ's statement characterizing her hallucinations as bad dreams and bad memories is an inappropriate medical opinion.  However, the court is of the opinion that the ALJ was merely resolving a conflict in the evidence presented to him.  In making the conclusion about the claimant's supposed hallucinations, the ALJ considered the claimant's testimony and her medical records.  The ALJ noted that the claimant probably did have some visual and auditory experiences; however, based on her vague and unconvincing testimony and the fact that she understood that the voices and visions she was hearing and seeing were not real, the ALJ concluded the hallucinations were more likely bad dreams and memories. In considering Troop's medical records, the ALJ found they all indicated her complaints about hallucinations.  Yet, he also found the records demonstrated that the claimant never appeared out of touch with reality or delusional.  Therefore, the court finds that the ALJ did not make any inappropriate medical judgments.  Rather, the ALJ properly resolved a conflict in the evidence, and his resolution is supported by substantial evidence.

## C.   Treating Source Evidence

The claimant also argues that the ALJ erred in the weight given to the treating source's opinions.  (Pl.'s Br. 13).  Specifically, the claimant contends that the

reasons the ALJ gave for discounting Dr. Ortell's opinions were not valid. (Pl.'s Br. 14-17); (Tr. 16-17, 470-72). However, the court is convinced that the ALJ did not commit error in giving Dr. Ortell's opinions less than considerable weight.

The Social Security regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques"; and (2) it is "not inconsistent" with substantial evidence in the record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(2)). Nonetheless, an ALJ may properly reject a doctor's opinion when considering an application for SSI benefits if it appears to be based on a claimant's exaggerated subjective allegations. *Dixon v. Massanari*, 270 F.3d at 1178. Furthermore, a claimant is not entitled to disability benefits simply because her treating physician states she is unable to work. *Id.* at 1177. Ultimately, it is the Commissioner, not a doctor selected by the patient to treat her, who decides whether a claimant is disabled. *Id.*

Dr. Ortell's medical opinion concluded that due to Troop's continued psychiatric impairment, she was unable to work. (Tr. 449). He filled out a medical assessment form to support this finding. Dr. Ortell's main conclusion was that the claimant had extreme restrictions and either fair or poor-to-no ability to perform basic work activities. (Tr. 472).

The ALJ discounted Dr. Ortell's opinions because he found that the doctor made conclusions which were not supported by the medical records of the claimant and invaded the province of the agency. (Tr. 17). He explained his reluctance to give Dr. Ortell's opinions controlling weight because he found they had been solicited solely for the purpose of the claimant's SSI claim and were based only on the claimant's subjective complaints and not on laboratory or clinical testing. (Tr. 17). The ALJ reasoned that, because Troop exaggerated her symptoms and was not entirely credible, any medical opinion based solely on her subjective complaints lacked credibility as well. (Tr. 17).

Because evidence existed in the record – reports from two non-examining consultants – that contradicted the report by Dr. Ortell, the presumption of controlling weight from the treating source rule does not apply.[11] Hence, it is only necessary to determine whether the ALJ provided a "good reason" to reject the treating physician's opinion. *Schaaf*, 602 F.3d at 875. The ALJ properly rejected Dr. Ortell's opinion because it was not based on objective evidence and was contradicted by substantial evidence in the record. Dr. Ortell expressed his medical opinions about Troop by checking a box next to a symptom or statement that was pre-typed by someone other than the doctor, and he did not elaborate on the bases of these

---

[11] 20 C.F.R. §404.1527(d)(2) lists a number of factors that the ALJ may consider in determining what weight to give the opinion of a treating source once it is determined the treating source's opinion is not entitled to controlling weight. These factors include: length of treatment, frequency of examination, nature and extent of the treatment relationship, support of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and so forth. The court is satisfied that the ALJ considered the relevant factors before discounting Dr. Ortell's opinion.

opinions. (Tr. 471-72). The ALJ expressed doubts about this assessment because Dr. Ortell's conclusions were based solely on Troop's subjective complaints, not objective medical facts. The ALJ properly reasoned that because Troop was not wholly credible – a decision we do not find error with – any medical opinion based solely on her own exaggerated remarks lacked credibility as well. As such, the court cannot find error with the ALJ refusing to assign considerable weight to Dr. Ortell's opinions.

## D.    Vocational Expert

Lastly, the claimant argues that the ALJ erred by failing to obtain a vocational expert opinion regarding the job base available to someone with her limitations. Troop correctly notes that the ALJ did not elicit testimony from a vocational expert during her hearing but instead based his step five determination on the Medical Vocational Guidelines (the "grids"). (Pl.'s Br. 10-11); (See Tr. 28-48). Troop contends that the ALJ's finding of a severe mental impairment at step two of the sequential assessment automatically required the use of a vocational expert at the hearing to answer step five of the test. (Pl.'s Br. 10). Troop also argues that because she has a non-exertional limitation,[12] the ALJ was required to use a vocational expert and not the grids. (Pl.'s Br. 11-12).

At step five of the sequential analysis for determining whether a claimant is disabled, the Commissioner must show that a significant number of jobs exist that

---

[12]Mental impairments are generally considered to be non-exertional. SSR 85-15.

the claimant can perform. *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004). To satisfy this burden, the ALJ may rely on one of the grids found in 20 C.F.R. § 404, Subpart P, App 2. *See Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). However, these rules are only dispositive when the claimant has exertional limitations. 20 C.F.R., Subpart P, App. 2 § 200.00(e). In cases involving non-exertional limitations, such as the instant case, the ALJ must cite other evidence for his conclusion that the claimant's employment opportunities are not significantly diminished. *Lee*, 988 F.2d at 793.[13]

Additional evidence for the ALJ's conclusion may come from vocational expert testimony, though expert testimony is not required. *See Ehrhart v. Sec'y of HHS*, 969 F.2d 534, 540 (7th Cir. 1992). An ALJ may proceed without vocational expert testimony if there is "reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986).

---

[13]The defendant correctly argues that utilization of the grids is not automatically precluded because a claimant suffers from a non-exertional limitation. (Def.'s Br. 8); *Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir. 1987). Use of the grids is insufficient if the ALJ finds that the non-exertional limitations are "severe enough to restrict a full range of gainful employment at the designated level." *Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). Though this is a question of fact for the ALJ, *Walker v. Bowen*, 834 F.2d at 641, and thus entitled to great deference, here the ALJ never discussed whether he found the claimant's mental impairments to be non-exertional or severe enough to preclude utilization of the grids. Without an adequate explanation for his decision to use the grids, other than that the state agency used them, the court cannot agree with the defendant that use of the grids was sufficient. Thus, we continue our review of whether the ALJ erred in his failure to use a vocational expert.

However, the ALJ in the instant case neither elicited vocational testimony, nor cited evidence that Troop's non-exertional limitations do not significantly diminish her employment opportunities. The only evidence the ALJ relies upon in his decision that vast numbers of unskilled jobs requiring below average interpersonal skills exist in the national economy is "common knowledge." (Tr. 23). He also states that he is adopting the reasoning of the state agency in this instance because they have "vast empirical experience" in dealing with such questions. (Tr. 23-24). However, the state agency used the grids to make their determination. (Tr. 23). As the court noted above, in cases involving severe non-exertional limitations, the ALJ is required to cite to evidence other than the grids. Adopting the decision of the state agency, when that decision was based solely on the grids, is not sufficient. Furthermore, the court finds that "common knowledge" is not "reliable evidence . . . that would persuade a reasonable person" that Troop's limitations do not significantly diminish the employment opportunities available." *Warmoth v. Bowen*, 798 F.2d at 1112. It may be that Troop can still perform a significant number of jobs which exist in the national economy; however, the present record does not support that determination. Therefore, the ALJ's determination is not supported by substantial evidence and the court will remand for the ALJ to provide vocational expert testimony or other evidence indicating that significant employment exists in the national economy that Troop can perform, given her limitations.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner denying the claimant's application for supplemental security income be and the same is hereby **VACATED and REMANDED** for further proceedings consistent with this opinion.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge